[L. A. No. 9536. Department One.—February 4, 1929.]

WALTON L. BENNETT, Cross-Defendant and Appellant, v. ARTHUR J. BROWN et al., Cross-Complainants and Respondents; SARAH E. BENNETT, Cross-Defendant and Appellant.

Goodwin J. Knight for Cross-defendant and Appellant Sarah E. Bennett.

James E. Fenton and Charles J. Kelly for Cross-defendant and Appellant Walton L. Bennett.

Frank G. Tyrrell for Respondents.

PRESTON, J.— The judgment in this cause is reversed, with directions to the court below to deny all relief on all issues between the plaintiff and the defendants, but without prejudice to the rights of the cross-defendant Sarah E. Bennett, who alone is entitled to have her costs of appeal herein as against the respondents.

This decision is made and this direction to the court below given because the record shows without substantial conflict that both plaintiff Walton L. Bennett and respondent Robert A. Brown have entered a court of equity with unclean hands asking for aid. Arthur J. Brown is the son of Robert A. Brown, who held a power of attorney from him, and all the transactions herein were made by the father so acting for the son; all acts upon the part of the son were imputable to the father and reference will hereinafter be made in the main only to the father. Robert A. Brown had several money judgments of record against him, which fact doubtless explains the existence of these transactions in the name of the son. The truth of the observation as to unclean hands will abundantly appear from the following:

Walton L. Bennett was at all times herein and for some years prior thereto living in discordant relationship with his wife, Sarah E. Bennett. A state of separation and of armed neutrality was in existence at the period herein considered. Bennett had considerable separate property, a part of which was the residence and contents therein, also certain personalty within the curtilage, all the subject of this action. The wife was in the home and refused to be ejected therefrom. She was defending her possessions against all comers and was breathing fumes of anathemas upon the head of her husband. Bennett sought to dispose of said property so as not to lose the right thereto and to a reconveyance thereof when he should have rid himself by divorce of the burden of said wife.

In the early part of 1921 he fell in with Robert A. Brown, a real estate broker who had offices in connection with those of his attorney and who immediately inclined an ear to his voice, and, with the sole intention of defeating the claims of said wife for alimony and maintenance, concocted the scheme of having Bennett deed said residence to Arthur J. Brown, the son of Robert A. Brown, and conveyed to him the household and kitchen contents of said building, which was accomplished by a document consisting of many pages of items which included everything in said home, even the crumb tray and the trusty rolling pin. This scheme was carried out on March 24, 1921. Arthur J. Brown in turn deeded to Bennett through his father as attorney-in-fact a tract of 160 acres of Texas land unknown and extremely uncertain in value—a tract of land to which the title was in doubt and likewise a tract which none of the parties had ever seen. Bennett also passed a check to Brown for $100, which he says was a camouflage and the proceeds thereof were returned to him later.

Bennett, with the knowledge and connivance of the elder Brown, then journeyed secretly into Nevada, there to establish a residence and stay the period of time required to sue said Sarah E. Bennett and thus to rid himself of the marriage tie and the concomitant obligations thereof. He reached Reno, Nevada, in a few days after execution of said conveyances, from which point he conducted a continued correspondence with the senior Brown, under the name of Livingston. Brown, in writing, aided and abetted him in every way in concealing himself from his said wife and in effectuating his purpose of removal. Brown gave him repeated bulletins upon the sayings and doings of his wife, who, until ousted by court proceedings, remained in the home.

The senior Brown, in the name of his said son, brought suit against Sarah E. Bennett for possession of the property, including the items of personalty aforesaid. The expenses of this litigation were paid by an attorney on behalf of Bennett. Finally, in August, 1921, Mrs. Bennett quitclaimed to Arthur J. Brown for $350, $250 of which was paid by Bennett himself, her interest in said property. Brown thus prevailed and the wife was ousted. The elder Brown then went into possession of the property. The correspondence

between Bennett and Brown continued and therein Brown guardedly but nevertheless effectually admitted a trust relationship in said property in favor of Bennett. In fact, after the quitclaim deed was executed by the wife, on one or two occasions he wrote that he had caused to be executed the necessary papers for a reconveyance of both the real and personal property to Bennett. After securing possession of said property, Brown continued in his efforts to keep Bennett's whereabouts concealed from the wife and offered many suggestions as to the method of so doing.

In the fullness of time, to wit, in September, 1922, Bennett brought his divorce action in Reno to trial, testifying that he owned no property; that no one held the property here in controversy or any other property in trust for him and that he had sold the property involved to the junior Brown. After the purpose of his trip to Nevada had been wrought, Bennett returned to Los Angeles to gather together the broken fragments of his former estate. He brought suit against the Browns, claiming that the trade made with them was a sham to defeat the wife. The Browns countered, claiming full title in themselves and asking affirmative relief by cross-complaint to this effect. In the meantime the wife, suspecting perfidy on the part of both her husband and the Browns, had brought a suit against them—against the husband for desertion and separate maintenance and against the Browns to upset the transfer here involved. Later, by amended cross-complaint of the Browns, she was made a party defendant to the present action and showed not only her claims as a deserted wife but also that she was a judgment creditor of her husband.

The court, by its findings, exonerated the Browns and confirmed the title in them, denying relief *in toto* to either Bennett or his said wife. To the extent that the findings exonerate Brown senior from being *particeps criminis* in the scheme to defraud the wife and to the extent that they hold that Brown did not with full knowledge receive the property to aid in that scheme, said findings are without substantial support in the evidence. We need not pause to discuss the fact that the evidence is in conflict as to the extent of the interest Bennett intended to convey to Brown in said property. It is sufficient for our purposes to know that

these parties were acting in concert with respect to the transaction to defraud Sarah E. Bennett. This being admitted, the law will lend help to neither party in a suit involving said transaction but will leave the parties where it finds them.

Under the above recital of facts no authorities need be amassed to show that equity will not afford either party relief. As to Sarah E. Bennett, who has appealed, attacking the transaction as fraudulent, the situation is different. She is entitled to have her claims adjudicated in the light of this palpable fraud against her. Her quitclaim deed under these circumstances may not be said by this court at least to foreclose her from relief upon her independent suit against the parties to this transaction or in the issues tendered by her in the present action.

Much more might be written in disposing of this cause. Counsel for appellant, omitting to recognize that we are not sitting as a trial court to resolve conflicting evidence, has amassed a brief of some 350 pages, dealing in a partisan way with the evidence. He fails wholly to see the fraud and perjury of his client. Respondents see these shortcomings of appellant and, while observing the mote in appellant's eye, fail wholly to see the beam in their own.

The facts of this case stir deeply the conscience of a court of equity and none of the parties should be heard in their petitions. There is, therefore, no alternative but to give the judgment first hereinabove announced.

Curtis, J., and Seawell, J., concurred.